A. Clayton **ROBBINS,** dba **Beltone Utah Company, Plaintiff and Respondent,**

v.

Douglas A. **FINLAY, Defendant and Appellant.**

No. 16958.

Supreme Court of Utah.

March 23, 1982.

Mark S. Miner, Salt Lake City, for defendant and appellant.

Russell C. Harris, Craig Stephens Cook, Salt Lake City, for plaintiff and respondent.

STEWART, Justice:

Douglas Finlay, defendant, was employed by plaintiff Robbins, dba Beltone Utah (hereafter "Beltone"), until December, 1975, to sell hearing aids. Beltone is a distributor of Beltone brand hearing aids. At that time, Finlay terminated his employment with Robbins and went into business for himself selling hearing aids. Beltone thereafter sued Finlay for breach of a covenant prohibiting unauthorized use of customer leads provided by Beltone and for breach of a covenant not to compete.

This is an appeal by defendant Finlay from a judgment entered on a jury verdict finding that Finlay had breached the covenants of his employment contract with Beltone. The judgment awarded Beltone damage amounts stipulated in the employment contract: $5000 for breach of a covenant not to misuse customer leads supplied by Beltone,[1] and $3000 for breach of a covenant not to compete with Beltone in its service area for a period of one year following termination of employment.[2] Plaintiff was also awarded $2500 as attorney's fees.

Finlay began working for Beltone in 1971 under an employment contract substantially

---

1. The pertinent provision of the employment contract provides:

The Company agrees to furnish the Consultant with a list of prospects for, and users of hearing aids, which list is herewith recognized by both parties as a trade secret of the business, and the Consultant agrees to make no copies of said list; to use it only in the course of the Company's business; and to return it to the Company immediately upon the termination of this Agreement. Consultant further agrees that in the event the said list is used for any other purpose to the detriment or damage of the Company by the Consultant or any other person as a result of his negligence or connivance that the stipulated damages and detriments to be paid by the Consultant shall amount to the sum of Five Thousand Dollars ($5,000.00) to the

Company on demand. Consultant further agrees that all new names added to such list, on account of new prospects and users of hearing aids, whether discovered by the Company or by the Consultant, shall be a part of the trade secret of the business as aforesaid.

2. The noncompetition clause provides:

After the termination of his employment for the Company for whatsoever cause, Consultant agrees that he will not engage in the business of selling or servicing hearing aids in the areas serviced by the Company in the State of Utah for a period of one year following the termination of his employment; and it is specifically agreed that if the Consultant violates this provision of the Agreement he shall be liable to the Company for stipulated

the same as the one involved here. The covenants at issue here are part of an employment contract entered into April 3, 1974. Finlay was an experienced hearing aid salesman, having worked previously for six Beltone distributors, and therefore did not receive the training provided for in the Beltone employment contract.

In August of 1975, Finlay in a letter to Mr. Robbins expressed dissatisfaction with the terms of his employment agreement with Beltone. The letter requested that he be put in charge of hiring and firing the sales staff, and that he be given a 5% override on their sales. He also requested an increase in his advertising allowance and an increase in his commission percentage. The testimony indicated that both parties intended to enter into a new employment agreement based at least partially on Finlay's demands, but no revised agreement was consummated. In December 1975 Finlay left Beltone and opened his own office in Salt Lake City for selling hearing aids.

Beltone presented testimony at trial establishing the following:

1. In November 1975 Finlay sold hearing aids other than Beltone products to three persons from Kamas, Utah, who had been identified as potential customers through a hearing clinic conducted under the auspices of Beltone. Beltone received no compensation from those sales.

2. Finlay had in his possession at least as late as November 1976 the names and addresses of 154 potential Beltone customers whose names had been given Finlay by Beltone.

3. In late 1975 Finlay induced another employee of Beltone to sell two hearing aids for a company which Finlay had formed. The sales were made through customer leads produced from a Beltone hearing clinic.

4. Beltone's service area is a strip running east and west across the State of Utah with the northern boundary defined by a line running through Farmington, Utah, and the southern boundary by a line running through the Point of the Mountain in southern Salt Lake County. Finlay does not dispute that he has competed with Beltone within Beltone's service area.

On appeal, Finlay raises two points. The first is that Beltone is not entitled to recover $5000 for misuse of Beltone's customer leads because Beltone suffered no actual business loss or damage. Finlay contends that the stipulated damages provision is therefore void and unenforceable because it constitutes a penalty. Finlay's second point is that the noncompetition clause is unenforceable because the restraint on competition is unreasonable and his employment was a common calling not subject to a covenant not to compete. Accordingly he seeks to have the stipulated damages award of $3000 set aside.[3]

The first issue to be decided is whether the $5000 awarded as stipulated as damages for breach of the covenant relating to customer leads is unenforceable as a penalty.

▮▮▮ The general rule in contract law is that the damages recoverable for a breach are those which arise naturally from the breach and which reasonably may be supposed to have been within the contemplation of the parties or are reasonably foreseeable. They are essentially compensatory in nature. *Pacific Coast Title Ins. Co. v. Hartford Accident and Indemnity Co.,* 7 Utah 2d 377, 325 P.2d 906 (1958); see also *Sprague v. Boyles Bros. Drilling Co.,* 4 Utah 2d 344, 294 P.2d 689 (1956). Liquidated damages provisions are viewed with some degree of suspicion because they may not reasonably approximate compensatory damages.[4] However, they are enforceable

---

damages in the sum of Three Thousand Dollars ($3,000.00), together with reasonable attorneys fees.

3. It should be noted that Beltone sought only to recover the $3,000 stipulated as damages for breach of the noncompetition clause and did

not seek to enjoin Finlay from competing with Beltone.

4. Also, if procured by fraud, mistake, overreaching, or oppression a liquidated damages provision is not enforceable. See *Thomas v. Foulger,* 71 Utah 274, 264 P. 975 (1928); *Walk-*

if designed to provide fair compensation for a breach based on a reasonable relation to actual damages. *Young Electric Sign Co. v. Vetas*, Utah, 564 P.2d 758, 760 (1977).[5] If stipulated damages represent a fair and reasonable estimate of damages, that is all that is required.

■ Liquidated damages provisions are justifiable on the ground that they promote economic efficiency when two contracting parties realize that damages would be very difficult to calculate in the event of a breach, even though "[t]he expected damages are readily calculable, ... the parties determine that advance stipulation will save litigation or settlement costs," or the contract deals with idiosyncratic values which would otherwise be difficult to protect. Goetz and Scott, Liquidated Damages, Penalties and the Just Compensation Principle: Some Notes on an Enforcement Model and a Theory of Efficient Breach, 77 Colum.L.Rev. 554, 559 (1977), (hereafter "Liquidated Damages"). But to be enforceable, a liquidated damages provision must not be a product of unfairness resulting from disparate bargaining positions, a lack of access to pertinent information,[6] or anomalies in the bargaining process, such as those posed by monopolies, duress, or contracts of adhesion.

■ Criteria establishing standards for determining reasonableness were established in *Johnson v. Carmen*, Utah, 572 P.2d 371 (1977), and *Perkins v. Spencer*, 121 Utah 468, 476–77, 243 P.2d 446 (1952). In

those cases the Court relied on Restatement of Contracts, § 339, which provides in pertinent part:

(1) An agreement, made in advance of breach fixing the damages therefor, is not enforceable as a contract and does not affect the damages recoverable for the breach, unless

(a) the amount so fixed is a reasonable forecast of just compensation for the harm that is caused by the breach, and

(b) the harm that is caused by the breach is one that is incapable or very difficult of accurate estimation.

■ The testimony at trial indicated that it was Beltone policy to restrict the number of leads a salesman had out at one time to' twenty or thirty. As of November 1976, Finlay had 154 leads in his possession, and they did not include those individuals to whom he eventually sold a competing brand of hearing aid in Kamas, Utah. The potential damages which might actually result under these circumstances from a breach of the customer lead covenant could vary within a wide range. There is no doubt that the harm caused by the breach was one that was difficult to estimate with much accuracy.[7]

■ The $5,000 forecast of just compensation for breach of the covenant relating to customer leads was not unreasonable. Although there is no direct evidence of the amount of profit Beltone realized from the

er v. Rocky Mountain Recreation Corp., 29 Utah 2d 274, 508 P.2d 538 (1973). Cf. Western Macaroni Mfg. Co. v. Fiore, 47 Utah 108, 151 P. 984 (1915). See also Wise v. United States, 249 U.S. 361, 39 S.Ct. 303, 63 L.Ed. 647 (1919).

5. Young cites Jacobsen v. Swan, 3 Utah 2d 59, 278 P.2d 294 (1954); Perkings v. Spencer, 121 Utah 468, 243 P.2d 446 (1952); Bramwell Investment Co. v. Uggla, 81 Utah 85, 16 P.2d 913 (1932). It should be noted that all three of the cited cases concern forfeiture provisions in contracts for the sale of real estate. Indeed, the vast majority of Utah cases dealing with liquidated damages are real estate contract cases.

6. According to Goetz and Scott:

Access to information at minimum cost is the first principle of bargain fairness. Where the bargain reflects processes which inhibit information exchange, the risk of allocative inefficiencies is enhanced. This constraint, identified in the unconscionability doctrine as "unfair surprise," would incorporate contracting behavior ranging from fraudulent exchange of false or misleading information to failures to reasonably disclose essential contract terms. Liquidated Damages, 77 Colum. L.Rev. 554, 591 (1977).

7. Furthermore, as pointed out in Liquidated Damages:

[A]s the uncertainty facing the contracting parties increases, so does their latitude in stipulating post-breach damages. Id. at 560.

sale of a hearing aid, there is evidence which shows that the price of a single hearing aid runs from $400 to $475. A double hearing aid retails for from $800 to almost $1,000. The commission that was due Finlay on a sale was 30%, or $120 to $140 for a single aid and $240 to $280 for a double hearing aid. Thus, Beltone would receive up to $335 for a single aid and $720 for a double. Twenty sales of single hearing aids could produce up to $6,700 gross revenues for Beltone while 154 such sales could produce gross revenues of over $50,000. Although the evidence is not compelling, it is sufficient on the facts of this case, in our view, to justify $5,000 as a reasonable estimate of anticipated damages.

■ It does not matter in this case that Beltone proved that Finlay had actually appropriated just five potential customers to his own use. If the liquidated damages provision is enforceable, a plaintiff need not prove actual damages. 5 Corbin on Contracts § 1062 (1964); 5 Williston on Contracts § 783 (3d ed. 1961), quoting *United States v. Bethlehem Steel Co.*, 205 U.S. 105, 119, 27 S.Ct. 450, 455, 51 L.Ed. 731 (1907); *United States v. LeRoy Dyal Co.*, 186 F.2d 460, 462 (3d Cir. 1950) cert. den. 341 U.S. 926, 71 S.Ct. 797, 95 L.Ed. 1357.

There is no evidence here of any unfairness in the bargaining process which should result in the unenforcibility of the provision in question. Finlay was an experienced hearing aid salesman who had worked for Beltone distributors in the past. He was a sophisticated salesperson, well versed and knowledgeable in the occupation which he pursued. The contracting parties were not in substantially disparate bargaining positions. See *Waggoner v. Johnston*, Okl., 408 P.2d 761 (1965). Nor is there evidence of error, duress, or a lack of market opportunities.

In sum, we conclude that the District properly entered judgment for breach of the covenant not to misuse the customer leads.

8. See Footnote 2, *supra.*

The second issue raised by Finlay is whether the anticompetition clause in the employment contract[8] is unenforceable because it is unreasonable and because the position of hearing aid salesman is a common calling.

■ Covenants not to compete are enforceable if carefully drawn to protect only the legitimate interests of the employer. The reasonableness of a covenant depends upon several factors, including its geographical extent; the duration of the limitation; the nature of the employee's duties; and the nature of the interest which the employer seeks to protect such as trade secrets, the goodwill of his business, or an extraordinary investment in the training or education of the employee. *Girard Inv. Co. v. Bello*, 456 Pa. 220, 318 A.2d 718 (1974). See also *Allen v. Rose Park Pharmacy*, 120 Utah 608, 237 P.2d 823 (1951); *Alston Studios, Inc. v. Lloyd V. Gress & Assoc.*, 492 F.2d 279 (4th Cir. 1974); *Antrim v. Pittman*, 189 Neb. 474, 203 N.W.2d 510 (1973).

■ In a general sense, the law balances the nature of the interest of one seeking to enforce such a covenant, whether by injunction or by stipulated damages, against the hardship imposed on the employee as the result of the restraint. *Allen v. Rose Park Pharmacy, supra.* See also, R. Callmann, The Law of Unfair Competition, Trademarks and Monopolies vol. 2 § 64.4 (3d ed. 1968); *Beltone Electronics Corp. v. Smith*, 44 Ill.App.2d 112, 194 N.E.2d 21 (1963). Covenants not to compete which are primarily designed to limit competition or restrain the right to engage in a common calling are not enforceable.

The case is clearly distinguishable from *Allen v. Rose Park Pharmacy, supra*, where a covenant not to compete was enforced because all the goodwill of the employer was associated with, and created by, the employee. In this case, the covenant served no purpose other than restricting an employee from competing with a former employer. There is nothing to indicate that Finlay was largely responsible for plain-

628

tiff's goodwill, and there is no contention or proof that Finlay was privy to any trade secrets plaintiff may have possessed. Nor is there any indication that his competition (except for the use of the customer leads) had any greater effect on plaintiff's goodwill, or other legally protectable interests, than the competition of any other salesman employed by a competitor of plaintiff. Indeed, although Robbins was an authorized dealer of Beltone hearing aids, he was not restricted from handling hearing aids of other manufacturers.

The record shows that Finlay's job required little training and is not unlike the job of many other types of salesmen. The company's investment in training him was small. In fact, he had previously worked as a Beltone salesman for other dealers in Canada. Furthermore, there is no showing that his services were special, unique, or extraordinary, even if their value to his employer was high. Thus, this case is similar to *Columbia Ribbon & Carbon Mfg. Co. v. A–1–A Corp.*, 42 N.Y.2d 496, 398 N.Y.S.2d 1004, 369 N.E.2d 4 (1977), where the court stated:[9]

> It is clear that [the covenant's] broad-sweeping language is unrestrained by any limitations keyed to uniqueness [of the employee's services], trade secrets, confidentiality or even competitive unfairness. It does no more than baldly restrain competition. This it may not do. [*Id.*, 398 N.Y.S.2d at 1006, 369 N.E.2d at 6.]

It is of no moment that defendant may have been especially proficient in his work. General knowledge or expertise acquired through employment in a common calling cannot be appropriated as a trade secret.

"The efficiency and skills which an employee develops through his work belong to him and not to his former employer." *Hallmark Personnel of Texas, Inc. v. Franks*, Tex.Cr. App., 562 S.W.2d 933, 936 (1978). The same principles apply to the covenant here. We hold that the covenant not to compete had the effect of preventing the defendant from exploiting skills and experience which he had a right to exploit. It makes no difference that the plaintiff sought to enforce the covenant by a damage remedy rather than by injunction. Plaintiff had no right to extract a toll from defendant for entering into competition.

We recognize that to some extent the customer leads which Finlay had were in the nature of trade secrets due to the time, expense, and effort which went into discovering the leads.[10] However, the customer leads were specifically protected by the provision analyzed in the first part of this opinion and the covenant not to compete was not justified as an additional protection.

We therefore conclude that the covenant not to compete is unreasonable and unenforceable. Due to this conclusion, it is unnecessary to address Finlay's other contention that the convenant not to compete was unreasonable because of the geographical area covered and the duration of the covenant.

Affirmed in part and reversed in part. No costs awarded.

OAKS and HOWE, JJ., concur.

HALL, C. J., and DURHAM, J., do not participate herein.

---

**9.** The Covenant in that case stated:

The Employee further expressly covenants that he will not, for a period of twenty-four months after the termination of his employment with the Company, directly or indirectly, for himself, or his agent or employee of, or on behalf of or in conjunction with any person, firm or corporation, sell or deliver any goods, wares and merchandise of the kind or character sold by the Company at any time during the term of his employment with the Company, or in any other manner, engage in the sale and delivery thereof within any terri-tory to which the Employee was assigned during the last twenty-four months prior to termination. [398 N.Y.S.2d at 1006, 369 N.E.2d at 6]

**10.** *Cf. Microbiological Research Corp. v. Muna*, Utah, 625 P.2d 690 (1981) where the company's customer list was found to be readily reproducible through the simple expedient of looking up the names and addresses of hospitals and clinics in the telephone directory and hence was not protectable as a trade secret. Such is not the case here.